## L. R. WREN ET AL. v. JIM HARRIS.

No. 3210.

1. **Contract by Guardian with Land Locator.**—Under Act of May 20, 1848, relating to guardians, it is made "the duty of every guardian of the estate of a minor to take care of and manage such estate in such manner as a prudent man would manage his own." It was within such authority for a guardian to contract with a land locator to locate a land certificate belonging to his ward, and to give a share in the land acquired to the locator for such location.

2. **Presumption of Legality.**—The evidence showing a contract by a guardian for the location of the land certificate on the shares, and it not clearly appearing whether the contract was made before or after the Act of May 20, 1848, went into effect, it will

be presumed in favor of the legality of the contract that it was made after the act took effect.

3.   **Performance of Contract to Locate Land—Facts.**—See facts showing a substantial compliance by the locator in locating the land so as to secure his locative interest.

APPEAL from Hunt.    Tried below before Hon. E. W. Terhune.

This is an appeal by Wren and others from a judgment in favor of Harris for one-third in the James May 320 acres headright.    The plaintiffs claimed the entire interest through heirs of said James May.    The defendant claimed one-third interest by purchase of the locative interest from parties who made the location under a contract with the guardian of the said James May, *non compos mentis.*

The opinion sufficiently states the necessary facts.

*W. L. McDonald,* for appellants.— 1.  In the absence of authority from the Probate Court having jurisdiction of the guardianship of James May, Alston, his guardian, had no legal right to make an executory agreement disposing of one-half of his ward's land certificate, and the rights of his ward are not divested thereby.    Const. 1845, art. 4, sec. 5; Hart. Dig., arts. 1555, 1556, 1557, 1163, 1084, 1527; Judson v. Sierra, 22 Texas, 365; Neal v. Bartleson, 65 Texas, 478; Rainey v. Chambers, 56 Texas, 17; House v. Brent, 69 Texas, 27; Harrison v. Ilgner, 74 Texas, 86; Hurst v. Marshall, 75 Texas, 452; Butler v. Stephens, 77 Texas, 599; Simmons v. Blanchard, 46 Texas, 266; Calloway v. Nichols, 47 Texas, 327; Kempner v. Wallis, 2 Ct. App. C. C., sec. 588; 1 Sayles' Real Estate Laws, art. 289; Hobby's Land Law, sec. 1134.

2.   The defendant having failed to prove the day or month "in the summer of 1848" when the contract was made between Alston and Lacy, and the probate law of 1848 not having gone into effect until the 7th day of August, 1848, and the probate law of 1846 being in force until said day, or nearly the entire summer of 1848, the legal presumption is that the Act of 1846 was in force when said contract was made, and the same being clearly unauthorized by said act is a nullity.

3.   Defendant can not complain if by his own laches plaintiffs were compelled to employ other persons to complete this contract in order to save themselves irreparable injury; and the facts show that such was the state of this case, defendant and his vendors admitting their own failure to perform their part of the contract, and giving as a reason therefor press of business and forgetfulness.    The long lapse of time and other circumstances created the presumption that Lacy had abandoned the contract made with Alston over forty years ago.    De Cordova v. Smith, 9 Texas, 129; Smith v. Hampton, 13 Texas, 459; Glasscock v. Nelson, 26 Texas, 150; Evans v. Hardeman, 15 Texas, 480; Collins v. Ballow, 72 Texas, 330; Byrnes v. Sampson, 74 Texas, 80; Ann Berta Lodge v. Leverton, 42 Texas,

18; Eason v. Eason, 61 Texas, 225; Gibson v. Fifer, 21 Texas, 260; Frost v. Wolf, 77 Texas, 455; Hobby's Land Law, secs. 528, 528a.

*Grubbs & Hefner* and *J. O. Terrell,* for appellee.

GAINES, ASSOCIATE JUSTICE.—This suit was brought for the recovery of a tract of land patented to James May. The plaintiff Annie May claimed title as an heir of the patentee, who was her father, and plaintiff Wren claimed through conveyances from her two sisters. The defendant disclaiming as to an undivided interest of two-thirds in the tract of land, set up title to one undivided third, and obtained a judgment therefor.

The record shows that in 1841 one N. K. Alston was appointed guardian of the estate of James May as a minor and as a person *non compos mentis.* The property of the estate was appraised at less than $300. Among that property was the land certificate by virtue of which the land in controversy was patented. It was appraised at $15. In 1849 the guardian made a report of his administration of the ward's estate, which was ordered by the court to be filed and recorded. Among other things he reported that he had made a contract with one Lacy for the location of the land certificate, and had agreed to give him for his services one-half of the land to be acquired thereunder.

Upon the trial of the cause Lacy testified to the contract, and also that he engaged one Robey to locate the certificate and to procure a patent, and agreed to give him one-third of the land for his services and expenses. In 1870 Lacy met Alston, the guardian, and informed him of his contract with Robey, and thereupon the guardian approved of his action and signed and delivered to him a written agreement in accordance with their original contract. Robey located the land and caused original and corrected field notes to be returned to the Land Office. He then sold his undivided one-third interest to the defendant.

The leading question in the case is whether or not the guardian had the power to make a contract for the location of the certificate in which it was stipulated that the locator should have a part of the land in consideration of his services and expenses. We are of opinion that this question must be answered in the affirmative. That a contract of such a character is not a contract for the sale of land is settled by repeated decisions of this court. It is simply an agreement between the owner of the certificate and the locator for the joint acquisition of land. The Act of May 20, 1848, relating to guardians, makes it "the duty of every guardian of the estate of a minor to take care of and manage such estate in such manner as a prudent man would manage his own estate." Pasch. Dig., art. 3903.

It is a matter of common historic knowledge confirmed by the records of this court that the usual manner of contracting for the location of land certificates at the date of the transaction in question was for the owner to

give the locator for his services and expenses an interest in the land to be acquired. On account of a scarcity of money at an early day this seems to have been a rule with rare exceptions.

Should no necessity exist for the sale of the ward's property the guardian having a certificate belonging to the estate would be under an imperative obligation to cause it to be located, and no satisfactory reason presents itself to our minds why he has not the power to make a contract for its location, the land to be divided between the locator and his ward. Whether his action would be prudent or not would be a question for the County Court upon a settlement of his accounts. The decisions of this court which hold that a guardian can not sell his ward's property except by virtue of an order of the County Court have no applicability to the question.

The evidence shows that the contract for the location of the certificate was first made in the summer of 1848. The time is not more definitely fixed. It is contended that since the Act of May 20, 1848, did not go into effect until August 7, 1848, the law of 1846 applies to the case, and that since that law does not contain the language quoted from the act of the later date, or any words of equivalent import, therefore the power to make the contract in question did not exist. We are not prepared to say that the guardian did not have the power as well under the Act of 1846 as under that of 1848, but let it be conceded for the sake of the argument that he did not. Then it being left doubtful by the direct testimony whether the contract was made before the later act went into effect or after, the presumption would be that the guardian had done his duty and that when he made the agreement the law was in force which empowered him to make it. And again, it appears that he renewed the contract in 1870, after he knew that Lacy had employed Robey to make the location and to procure the patent.

It is also urged that the defendant should not have recovered because Robey failed to comply with the terms of the contract. Lacy was not only to locate the certificate, but also to pay all expenses and to procure the patent. The first field notes sent to the Land Office by Robey were found to be incorrect and he caused corrected field notes to be made out and sent up. According to his best recollection he had money in the Land Office to his credit, but on account of a defect to be hereafter mentioned the patent did not issue. After defendant Harris bought, having learned that the patent had not issued, he deposited $15 to pay the office fees and demanded a patent. The Commissioner wrote that the patent could not issue on account of the litigation over the land in Mercer's Colony, in which the survey was situated.

In 1889 the plaintiff filed in the Land Office a protest against the patent being issued to any one but himself. He caused corrected field notes to be sent up, and upon them the patent was issued. In the field notes as

first corrected there was a call as follows: "Thence west 1995 varas with Becton's south line to his southwest corner." In the field notes upon which the patent issued the call read: "Thence west with the south boundary line of the Becton survey 1975 varas a stake." Both sets of field notes embraced precisely the same land, and we think the correction immaterial. The field notes of the Becton showed that its south line was 1995 varas, whereas the first set of corrected field notes would have made it only 1975 varas long. There was no evidence to show that in point of fact the Becton line was more than 1975 varas, and that the surveyor who made the first corrected field notes did not measure it correctly. But in any aspect of the case the last correction was of no especial importance. The locator had substantially complied with his contract, except possibly in failing to tender the patent fees. Money had been deposited by the defendant for this purpose before the patent was issued. The court gave judgment against the defendant for $12, the cost of the second corrected field notes. This was all the plaintiffs had the right to demand.

There are very numerous assignments of error upon findings of fact and conclusions of law found by the court, but their determination does not affect the result of the case in the view we take of it.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

Delivered November 11, 1890.

Motion for rehearing refused.