**ABBOTT et al. v. GULF PRODUCTION CO. et al.**

No. 2987.

Court of Civil Appeals of Texas. Beaumont.

Dec. 23, 1936.

Rehearing Denied Jan. 20, 1937.

Vinson, Elkins, Weems & Francis, of Houston, and Thos. J. Baten and Oliver J. Todd, both of Beaumont, for appellants.

A. M. Huffman, of Beaumont, Llewellyn & Dougharty, E. B. Pickett, Jr., P. C. Matthews, and Cain & Miles, all of Liberty, and E. J. Fountain, Jr., Sewell, Taylor, Morris & Garwood, Williams, Lee, Sears & Kennerly, Fred W. Moore, R. F. Burns, H. F. Montgomery, Irwin W. Coleman, John E. Green, Jr., and Andrews, Kelley, Kurth & Campbell, all of Houston, for appellees.

WALKER, Chief Justice.

In the court below appellants, R. W. Abbott et al., were plaintiffs, and appellees, Gulf Production Company et al., were defendants. The action was in trespass to try title, putting in issue the title and possession of the south half of the Clayton Harper League of land in Liberty County. The pleadings of the parties presented the general issue in trespass to try title, the plea of not guilty, with pleas of all the statutes of limitation relating to land. The appeal is from a judgment in favor of appellees for the land in controversy entered upon an instructed verdict.

By the following facts appellants established in themselves a prima facie case for all the land sued for: Clayton Harper immigrated to Texas in 1826, and, prior to his death, perfected his right to a headright certificate to one league and labor of land. After his death in Liberty County, William Hardin was made the guardian of his sole heir, his minor daughter, Margaret Harper, and on his application, the Board of Land Commissioners of Liberty County on February 1, 1838, issued to the heirs of Clayton Harper a headright certificate for one league and labor of land. This certificate to the extent of one labor of land was located in Tyler County, for which patent duly issued. Certificate No. 697/796 was issued to the heirs of Clayton Harper for the unlocated balance. Margaret Harper, the sole heir of Clayton Harper, was married twice. Her first husband was Napoleon Magruder; her second, J. W. Hall. By deed dated the 23d of November, 1855, Margaret Hall, joined by her husband, J. W. Hall, transferred the unlocated balance certificate to W. C. Abbott. This deed described the land conveyed as "all our right, title, and interest to the headright certificate of Clayton Harper for one league of land and the location thereof wherever located; it being supposed to be located in McLennan County," and an abortive attempt was made to locate the land in McLennan County. Subsequently, on December 30, 1856, A. N. B. Tompkins, acting for the heirs of one A. B. Hardin, located the certificate on the Clayton Harper League of land in Liberty County, being the league now in issue; patent was duly issued on the 9th day of March, 1875, to Clayton Harper, his heirs or assigns. Appellants hold the land in controversy under a regular chain of title from and under W. C. Abbott. These facts made out a prima facie case in favor of appellants for the land sued for. It is the settled law of this state that the location of a valid land certificate upon a specific piece of land vests the title to such land in the owner of the certificate. Duren v. Houston & T. C. Ry. Co., 86 Tex. 287, 24 S.W. 258. The superior title vests in the owner of the certificate as of the date of its location and not as of the date of the patent. Cagle v. Sabine Valley Timber & Lumber Co., 109 Tex. 178, 202 S.W. 942, 6 A.L.R. 1426. To the extent that W. C. Abbott owned the Clayton Harper certificate under a deed from Margaret Hall—and it is conceded that he owned a half interest in the certificate, the other half being the subject of this law suit—the patent, when issued, vested in him the legal title to the Clayton Harper League, notwithstanding, under the facts of this case, the location in 1856 was not made by him or for him by Tompkins, but for A. B. Hardin. Beatty v. Masterson, 77 Tex. 168, 13 S.W. 1014; Fine et al. v. Freeman, 83 Tex. 529, 17 S.W. 783, 18 S.W. 963; Seibert v. Richardson, 86 Tex. 295, 24 S.W. 261.

Acting for A. B. Hardin, Napoleon Magruder, husband of Margaret Magruder, deputy surveyor of Harris County, located this certificate in 1839, except for the extent of a conflict with adjoining surveys, upon the very land subsequently appropriated under this certificate in 1856 by the A. N. B. Tompkins location. The Magruder location did not defeat appellants' prima facie case for the survey of the land in Liberty County by the deputy surveyor of Harris County was a nullity. In Linn v. Scott, 3 Tex. 67, it was held, quoting from the syllabus: "A survey made by the surveyor of any other county than that in which the land lies, is a nullity, and confers no right of action on the party holding it."

See, also, Paschal's Digest, art. 4522; Sayles' Real Estate Laws of Texas, art. 500; Peacock v. Hammond, 6 Tex. 544; Gulf, West Texas & Pacific Ry. Co. v. Cornell, 84 Tex. 541, 19 S.W. 703; Kirby Lumber Co. v. Gibbs Bros. & Co. (Tex. Civ.App.) 3 S.W.(2d) 819.

Appellees held the south half of the Clayton Harper League under a regular chain of title from and under A. B. Hardin, which they insist was superior, as a matter of law, to the title offered in evidence by appellants. It was their theory that A. B. Hardin entered into a contract with William Hardin, guardian of Margaret Harper, minor, by the terms of which he was to locate the Clayton Harper certificate No. 34, have the land surveyed, secure patent therefor, and pay all expenses incident thereto, and in consideration for his services in this behalf was to have title to one-half of the land so located, surveyed, and patented. No such contract was in evidence, but appellees offered in support of this theory of the case the following facts and circumstances: The courthouse of Liberty County and all the records of Liberty County were destroyed by fire in December, 1874. As stated above, Napoleon Magruder, acting for A. B. Hardin, attempted

to locate the Harper certificate upon the Clayton Harper League as it was subsequently surveyed by Tompkins in 1856, except as to 'a small conflict with the adjoining surveys. The following indorsements were made on the Magruder field notes:

"Houston, 31st. Dec. 1842—Received of A. B. Hardin the sum of Forty 30/100 Dollars in the Promissory Notes of the Republick, it being for land dues to the Government on the within land, namely, seven labors of arable at $2.50 per labor—$17.50 and nineteen labors pasture land at $1.20—$22.80. $40.30.

"Witness my signature and private scrowl for seal, the day and date above written.

"A. P. Thompson,
"[Seal]          Chief Justice, H. C."

On the 11th day of September, 1839, A. B. Hardin filed with the General Land Office the following certificate: "This is to certify that N. Magruder a Deputy Surveyor of the County of Harrisburg has surveyed for me as Agent for Clayton Harper 25 Labors of land situated on the East side of East San Jacinto and joining B. Tarkinton's on the West. Being part of the land to which he is entitled by virtue of Certificate No. 34 issued by the Board of Land Commissioners for the County of Liberty."

The following additional facts and circumstances were in evidence in support of appellees' theory of the existence of A. B. Hardin's contract with William Hardin; summary taken from appellees' brief:

"Deed from Napoleon Magruder and Margaret Magruder, his wife, dated September 29, 1846, conveying to A. B. Hardin the south half of the Clayton Harper Survey. This deed recites the consideration to be 'a certain contract made and entered into between the said Hardin, and the Court of Probate of the County aforesaid by which the said Hardin was to locate a certain league and labor of land, the headright of Clayton Harper, deceased, as well as one dollar to us in hand paid by the said Hardin.' (This deed was void because of the wife's defective acknowledgment.)

"Letter of C. L. Cleveland, attorney for A. B. Hardin, to Hon. S. Crosby, Commissioner of the General Land Office, dated November 10, 1853, inquiring whether patent had issued to the '4428 acres Headright of Clayton Harper lying in Liberty Co. E side of the E San Jacinto.'

"Letter of A. B. Hardin by his attorney, C. L. Cleveland, To Hon. S. Crosby, Commissioner of the General Land Office, dated March 2, 1855, protesting the patenting of land in 'one of the frontier districts' by virtue of the Clayton Harper headright certificate, and setting up his claim by virtue of the Liberty County location, his contract and deed from Margaret (Harper) Magruder.

"Field notes of a resurvey of 25 labors of land made for Clayton Harper, dated November 18 to 24, 1856, and filed in the General Land Office on January, 20, 1857. These field notes recite that the land embraced therein is a 'part of the land surveyed for him (Clayton Harper) by N. Magruder by virtue of Certificate No. 34 issued by the Board of Land Commissioners for Liberty County.' It was on these field notes that the Clayton Harper one league survey in Liberty County was patented on March 19, 1875.

"Letter from A. N. B. Tompkins to Hon. S. Crosby, Commissioner of the General Land Office, dated February 17, 1857. This letter shows beyond dispute that at that date A. B. Hardin had completely performed everthing within his power under his contract. It shows conclusively that the survey by Tompkins in 1856 was made at the instance and expense of A. B. Hardin.

"Power of attorney dated November 28, 1873, executed by the 'surviving children and heirs at law of Augustine B. Hardin' (A. B. Hardin died in 1871) to Davis & Hardin, Attorneys, employing the attorneys to procure patent to the Clayton Harper survey from the General Land Office.

"Correspondence of Davis & Hardin, attorneys, with J. J. Groos, Commissioner of the General Land Office, in July, August and September, 1874, relative to the 'transfer from Margaret Magruder to A. B. Hardin'.

"Correspondence of Geo. W. Davis, attorney, with Hon. J. J. Groos, Commissioner of the General Land Office, in April, 1875, relative to the issuance of the patent on the Clayton Harper one league survey in Liberty County.

"Patent No. 580, Vol. 20, issued on March 19, 1875, to the heirs of Clayton Harper, deceased, covering one league of land in Liberty County. The following endorsement appears in the margin: 'Delvd to Geo. W. Davis 27 April 75.'

"Entries in Patent Delivery Book of the General Land Office, E. to K., January to April, 1875, page 201. Note line 30, showing that patent to Clayton Harper survey, dated March 19, 1875, covering 25,000,000 square varas of land in Liberty County, was delivered to Geo. W. Davis on April 27, 1875.

"File Wrapper to File 223, Harris County 1st Class, Clayton Harper, 1 league. This wrapper bears the endorsement 'Pat Delvd to Geo W Davis April 27/75.' "

In addition to this documentary evidence of the locative contract and its performance by A. B. Hardin and his heirs, the following circumstances also point to the existence of such contract:

"First:  Long Asserted, Open, and Adverse Claim by Hardin, His Heirs and Assigns.

"1. Possession.

"a. The Kirby Lumber Company, claiming under deeds from heirs of A. B. Hardin, has cut timber off a tract in the southeast corner.

"b. The Grogan Manufacturing Company, claiming under deeds from heirs of A. B. Hardin, has built tram roads, and cut timber off various portions of the south half of the survey.

"c. The Texas Long Leaf Lumber Company, under deed from Wirt Davis et al., entered in 1921, built a tram road the full length of the survey, established camps and cut timber all along the tram road.

"d. W. A. Wells, under a deed from an heir of A. B. Hardin to an undivided interest, went into possession of a part of the south half of this survey and his heirs and vendees have continued that possession from about 1894 to date.

"e. R. G. Gilchrist, under a deed from an heir of A. B. Hardin, went into possession of a portion of the south half of this survey about 1899 and his heirs have continued that possession to date.

"2. Rendition and payment of taxes.

"a. During the years 1850 to 1859, inclusive, A. B. Hardin rendered for taxation 2,214 acres of the Clayton Harper survey, abstract 209, situated in Liberty County, Texas.

"b. From 1875 to 1934, the heirs of A. B. Hardin and their vendees have rendered their respective interests in the south half of the Clayton Harper survey for taxation, and paid taxes thereon, with more or less regularity.

"3. Dealing in the land.

"a. On November 28, 1873, the heirs of A. B. Hardin conveyed one-half of the south half of the Clayton Harper survey to Geo. W. Davis and W. F. Hardin, Attorneys, by power of attorney.

"b. Since the above date, numerous instruments, including warranty deeds, wills, partition deeds, leases, etc., have been put on record in Liberty County by which the heirs of A. B. Hardin and their vendees have purported to pass title to various portions of the south half of this survey.

"4. Inventories in estates of decedents.

"a. Wm. F. Hardin died April 5, 1908, leaving a will probated July 8, 1908. The inventory filed July 10, 1908, lists among other lands in Liberty County 642 acres in the Clayton Harper survey, valued at $1,926.00.

"b. Helen B. Hardin Eaton, surviving wife and sole devisee of Wm. F. Hardin, died March 5, 1914, leaving a will which was probated July 9, 1914. While the inventory and appraisement of this estate does not appear on record in Liberty County, the records show that 642 acres of the Clayton Harper survey were rendered for taxation for the year 1914 in the name of 'Helen B. Eaton, Dec'd,' and the following year in the name of Mrs. Geraldine Humphreys, who was the devisee under Mrs. Eaton's will.

"c. Geo. W. Davis died September 27, 1898, leaving a will which was probated in Dallas County on January 31, 1899. The inventory and appraisement of this estate is not on file in Dallas County, but the records show that for the years 1901 to 1905, inclusive, 553⅓ acres of the Clayton Harper Survey was rendered for taxation by 'Writ Davis, Agt., Estate Geo. W. Davis,' and after that time was rendered by Mrs. Camilla G. Davis, the sole devisee of Geo. W. Davis.

"Second:  Nonclaim by the Abbotts, Their Heirs and Assings.

"1. Possession.

"a. There was no evidence that there has ever been any possession of any part of the south half of the Clayton Harper Survey by W. C. Abbott, nor by anyone claiming under him.

"2. Rendition and payment of taxes.

"a. The certificate of Geo. H. Sheppard, Comptroller, dated January 30th, 1935, shows that W. C. Abbott, William C. Abbott, Ann C. Abbott, R. W. Abbott, Reginald Abbott, and R. Abbott, are all the persons by the name of Abbott who have ever rendered any lands in Liberty County for taxation.

"b. This certificate also shows that some one, or more, of the above persons have rendered lands in Liberty County for taxation each and every year from 1842 to 1933, inclusive, and at no time have any of the above-named persons ever rendered any lands in the Clayton Harper survey.

"c. The records in the office of the Assessor and Collector of Taxes of Liberty County show that during the period from 1900 to 1934, inclusive, none of the above parties ever paid any taxes on any land in the Clayton Harper survey. The records of that office are not available prior to 1900.

"3. Dealing in the land.

"a. The only deed appearing in evidence executed by the Abbots to any portion of the south half of the Clayton Harper survey is a deed dated November 26, 1906, and executed by Ann C. Abbott and Reginald Abbott in favor of Herman Dierks. This is a quitclaim deed and was executed just three days after Herman Dierks had secured deeds from the Hardin heirs to the identical interest covered by that deed. The deed from the Abbots refers to the deeds from the Hardin heirs covering this same interest by book and pages. The deed from the Abbotts recites a consideration of $25.00, while the deeds from the Hardin heirs, which are deeds of general warranty, recite considerations totaling $1,753.60.

"4. Inventories in estates of decedents.

"a. W. C. Abbott died intestate in the year 1863 and left surviving him as his only heirs, his son, Reginald Abbott, and his widow, Mrs. Ann C. Abbott. There was an administration on his estate, as indicated from the certificate of the Comptroller, which shows that for the years 1865 to 1868, inclusive, J. O. Shelby, Administrator, rendered lands in Liberty County for the Estate of W. C. Abbott, but none in the Clayton Harper.

"b. Mrs. Ann C. Abbott died on September 22, 1910, and left a will devising her property to Mary J. Chambers for life, with remainder over to her grandnephew, R. W. Abbott.

"The inventory of the estate of Mrs. Abbott was filed with the Probate Court on January 16, 1911, and approved on January 17, 1911. This inventory lists the following real estate in Liberty County:

| Acres | Survey | Value |
|---|---|---|
| 2125 | Beasley Pruiett | $8,000.00 |
| 600 | E. M. Tanner | 2,000.00 |
| 47½ | N. Lynch | 200.00 |
| Block in Town of Liberty | | 1,500.00 |

"This inventory lists no land in the Clayton Harper survey.

"Third: Acquiescence by the Abbotts, Their Heirs and Assigns, in Adverse Claim.

"1. On September 29, 1846, Margaret (Harper) Magruder as the sole heir at law of Clayton Harper, joined by her husband, Napoleon Magruder, recognized the rights of A. B. Hardin to the south half of the Clayton Harper survey and executed a deed to A. B. Hardin covering the south half of this survey.

"2. W. C. Abbott, his wife, Ann. C. Abbott, and son, Reginald W. Abbott, all lived in the town of Liberty in Liberty County, the length of residence of the three combined being almost a hundred years.

"3. When the north half of the Clayton Harper survey was sold for taxes in 1878, and bought in by W. F. Hardin, Mrs. Ann C. Abbott and R. Abbott apparently redeemed that part of the north half of that survey lying east of the railroad, containing 1879 acres. W. F. Hardin was at that time asserting claim to 1,107 acres in the south half of the survey for himself and his partner, Geo. W. Davis, under conveyance from the heirs of A. B. Hardin, and there is nothing to show that Mrs. Abbott or Reginald W. Abbott ever disputed this claim.

"4. In 1906, Mrs. Ann C. Abbott and Reginald W. Abbott, executed a quitclaim deed to an undivided 444 acres in the south half of this survey to Herman Dierks for a nominal consideration of $25.00, when there were warranty deeds on record, and of which they had actual knowledge, from the heirs of A. B. Hardin conveying this identical interest for a consideration of $1,753.60.

"5. The heirs of W. C. Abbott, holding a quitclaim deed to the entire Clayton Harper survey, have taken and sold the entire

north half of this survey, but there is no evidence that they have ever asserted any claim to any part of the south half until this suit was filed.

"Fourth: Assertion of Title to and Sale by the Abbotts of the North Half of the League.

"1. The Abbotts' title was based on the quitclaim deed executed November 23, 1855, by Margaret (Harper) Hall and her husband, J. W. Hall, to W. C. Abbott, quitclaiming 'all our right, title and interest in and to the headright certificate of Clayton Harper for one league of land and the location thereof, wherever located, it being supposed to be located in McClennan County'.

"2. There was a tax deed from Sip Lacour, sheriff of Liberty County, to Wm. F. Hardin, dated August 6, 1878, conveying to said Hardin all of the north half of the Clayton Harper League.

"3. On July 8, 1882, Ann C. Abbott and Reginald W. Abbott (who held title under the quitclaim deed from Margaret (Harper) Hall to W. C. Abbott) made a deed to Wm. F. Hardin, conveying a small part of the north half of the Clayton Harper league. This is a general warranty deed.

"4. On September 29, 1882, Ann C. Abbott and R. (W.) Abbott made a deed to Hugh Jackson conveying an interest in all of the north half of the Clayton Harper league except that conveyed to Wm. F. Hardin by the deed identified under (3) above.

"5. On February 22, 1883, Ann C. Abbott, R. (W.) Abbott, and Hugh Jackson deeded to S. J. Sampson '1879 acres of land * * * being part of the north half of the Clayton Harper league'.

"6. It was stipulated by counsel that from and under the deed to S. J. Sampson, conveying 1879 acres 'various people have become owners under Sampson to that area of the north half of the Harper league and from that time to this there have been numerous transfers passing title to different subdivisions of the north half into different people, and that a number of people have gotten title under those different deeds, and different people have gotten deeds under that Sampson deed as the source of that title, and during that passage of years have exercised dominion over and asserted title to those several divisions and respective portions of the north half of the Harper league.'"

Without discussing the weight of the evidence in this case, it is our conclusion that appellees established, as a matter of law, the fact that William Hardin made the contract with A. B. Hardin in all material respects as claimed by appellees.

But conceding that Wm. Hardin as guardian of the estate of Margaret Harper, minor, made the contract with A. B. Hardin in the terms and on the conditions contended for by appellees, appellants insist that it was absolutely void under the provisions of the probate law of the Republic of Texas. From the briefs of counsel and the books furnished us by them, our only source of investigation, we conclude that the following provisions of the Mexican Civil Law and of the law of the State of Louisiana, in force at the time of the execution of the A. B. Hardin contract, constituted the probate law of the Republic of Texas:

The Constitution of the Republic of Texas, adopted in 1836 (Schedule, § 1), provided: "That no inconvenience may arise from the adoption of this constitution, it is declared by this convention that all laws now in force in Texas, and not inconsistent with this constitution, shall remain in full force until declared void, repealed, altered, or expire by their own limitation" (1 Laws of Texas, 1069, 1077).

By ordinances and decrees of the provisional government of the Republic of Texas, passed at San Felipe de Austin, January 16, 1836, 1 Gammel's Laws of Texas, 1040, it was provided as follows: "Sec. 3. Be it further ordained and decreed, etc., that all proceedings relative to succession on matters of probate, etc., shall be regulated and governed agreeable to the principles and laws in similar cases in the State of Louisiana."

Appellees cite us to article 134, p. 32, of Schmeitz's Law of Spain and Mexico: "As to the administration of the minor's property he must manage it like a prudent father of a family." And to article 327 of section 10 of chapter 1, title 8, of "Minors and Their Tutorship" of the Civil Code of Louisiana, published in 1838:

"The tutor shall have the care of the person of the minor, and shall represent him in all civil acts.

"He shall administer his estate as a prudent administrator would do, and shall be responsible for all damages resulting from a bad administration.

"He cannot either personally, or by means of a third person, purchase, lease or hire the property of the minor, or accept the assignment of any right or claim against his ward."

Appellants cite us to article 336 of the same Code of Louisiana: "The sale of the property of the minor shall be authorized by the judge, and made at public auction, after having been duly advertised in English and French, during ten days for movables, and thirty days for immovables and slaves." And to the following paragraphs of "Hall's Mexican Civil Law": Paragraph 2007: "A sale of real estate of a minor is null if it is not made by a judicial sale at public auction." And paragraph 2008: "A tutor cannot sell or lease the property of the minor, nor make any contract relative thereto for himself, for his wife, children, or brothers by consanguinity or affinity, even with judicial license, nor at public auction or otherwise."

Appellants also cite article 2396 of "Domat's Civil Law" by Strahan, edited by L. S. Cushing, published in 1861: "To justify the alienation of any of the lands or tenements belonging to a minor, it is required that the sale be made for a necessary cause, such as paying off debts that are pressing, of which the payment cannot be delayed, and which cannot be acquitted any other way; that this sale be directed by a court of justice, after it has been made to appear, by producing an inventory of the goods of the minor, and a stated account given in by the tutor, that there is neither money nor movables nor debts nor rents due, or to become due, nor other effects that may suffice for the payment of the said debts; so that it is necessary to alienate some of the lands or tenements. And it is likewise necessary to make choice, for the said sale of the lands or tenements, of those that are of least value, and that no more of them be sold than what is absolutely necessary, that they be sold by cant or auction, by order of the judge, after the delays which have been regulated, and the advertisements for giving notice to the parties concerned, and the buyers, and lastly, that the price of the sale be applied to the payment of the debts."

It appears from our findings above that Wm. Hardin made the contract with his brother, A. B. Hardin, but there is no contention that it was made "at public auction," nor is there any evidence that the contract was based upon the advertisement provided for by article 336 of the Code of Louisiana, supra, nor that it was made for "a necessary cause," as defined by section 2396 of Domat's Civil Law. Because the contract was not made in compliance with the cited provisions of the laws of Mexico and Louisiana, appellants insist that it was absolutely void.

█ The first inquiry is to determine the nature of the A. B. Hardin contract for the location of the Harper certificate. In Wren v. Harris, 78 Tex. 349, 14 S.W. 696, 697, our Supreme Court had before it the construction of a contract made by a guardian for the location of a land certificate belonging to his ward's estate; it was said:

"The leading question in the case is whether or not the guardian had the power to make a contract for the location of the certificate, in which it was stipulated that the locator should have a part of the land in consideration of his services and expenses. We are of opinion that this question must be answered in the affirmative. That a contract of such a character is not a contract for the sale of land is settled by repeated decisions of this court. It is simply an agreement between the owner of the certificate and the locator for the joint acquisition of land. The act of May 20, 1848, relating to guardians, makes it 'the duty of every guardian of the estate of a minor to take care of and manage such estate in such manner as a prudent man would manage his own estate.' Pasch. Dig., art. 3903.

"It is a matter of common, historic knowledge, confirmed by the records of this court, that the usual manner of contracting for the location of land certificates at the date of the transaction in question was for the owner to give the locator for his services and expenses an interest in the land to be acquired. On account of a scarcity of money at an early day, this seems to have been a rule, with rare exceptions.

"Should no necessity exist for the sale of the ward's property, the guardian, having a certificate belonging to the estate, would be under an imperative obligation to cause it to be located, and no satisfactory reason presents itself to our minds why he has not the power to make a contract for its location, the land to be divided between the locator and his ward. Whether his action would be prudent or not would be a question for the county court, upon a set-

tlement of his accounts. *The decisions of this court which hold that a guardian cannot sell his ward's property except by virtue of an order of the county court have no applicability to the question.* * * *

"It is contended that since the act of May 20, 1848, did not go into effect until August 7, 1848, the law of 1846 applies to the case, and that since that law does not contain the language quoted from the act of the later date, or any words of equivalent import, therefore the power to make the contract in question did not exist. *We are not prepared to say that the guardian did not have the power as well under the act of 1846 as under that of 1848.*"

The contract before us is on all fours with the contract before the Supreme Court in Wren v. Harris. On the conclusion of the Supreme Court in that case it follows that the Hardin contract was not a contract for the sale of land nor for the sale of an interest in the certificate as such, but was merely a contract between the guardian and his brother for the joint acquisition of land whereby the guardian was to furnish the certificate and his brother, A. B. Hardin, was to locate the certificate, have the land surveyed, and pay all land dues, etc. The land certificate merely became one of the assets of the joint enterprise and, of course, A. B. Hardin, as a member of the joint enterprise, acquired an undivided one-half interest in all its assets, provided the contract was legal and binding on the parties. Wren v. Harris stresses the point that even if there was no necessity for the sale of any part of Margaret Harper's estate, as required by the cited section of Domat's Civil Law, yet, William Hardin was under the imperative duty to have the certificate located. If there was no necessity for the sale of any part of his ward's estate, then William Hardin's duty to locate the certificate did not fall within the provisions of the probate law regulating the sale of his ward's property, but was within the powers and duties imposed by law upon him, regulating the administration of his ward's estate, particularly the provisions of article 134 of Schmeitz's Law of Spain and Mexico quoted above, which reads as follows: "As to the administration of the minor's property he must manage it like a prudent father of a family." We are confirmed in this construction of the A. B. Hardin contract by the following provision quoted above from Wren v. Harris: "*The deci-*

*sions of this court which hold that a guardian cannot sell his ward's property except by virtue of an order of the county court have no applicability to the question.*"

The act of May 28, 1848, made it the duty of the guardian to manage the estate of his ward "in such manner as a prudent man would manage his own estate." Giving effect to that provision of the act in Wren v. Harris, the Supreme Court said as shown by the above quotation: "Whether his action would be prudent or not would be a question for the county court, upon a settlement of his accounts."

If we are correct in our conclusions that the provisions of the probate law in effect in 1836, regulating the sale of the ward's property, have no application to the A. B. Hardin contract, then the conclusion necessarily follows that article 134 of Schmeitz's Law of Mexico, supra, providing that a guardian must manage his ward's estate "like a prudent father of a family," should be given the same construction given by the Supreme Court in Wren v. Harris to the provisions of the Act of 1848, that the guardian must take care and manage his ward's estate "as a prudent man would manage his own estate." Under Wren v. Harris, William Hardin's conduct in this respect was a question for the county court of Liberty County upon the settlement of his accounts. There is no claim by appellants that the contract was in any way reviewed or questioned on the settlement of William Hardin's accounts as guardian of Margaret Harper. We think it necessarily follows that the contract was in every essential valid and binding upon William Hardin as guardian, and upon the estate of his ward.

We quote the following proposition from appellants' brief: "It might be that under certain circumstances if he paid $40.00 as alleged, or if he did any work, he might have had a right to reimbursement under a quantum meruit, but we are not interested in that question at this time. If he had a remedy, however, this was the remedy." A. B. Hardin was not a "volunteer" in his expenditure of the "$40.00," but incurred this expense as an obligation under his contract with Margaret Harper's guardian. By the execution of that contract and by his good-faith expenditures under its terms, A. B. Hardin acquired a vested interest in the certificate in question and in the land to be located thereunder. Under no theory of the case could his rights have

been limited, against his wishes, to the issue of "a quantum meruit."

Appellants advance the following additional propositions against the instructed verdict:

■. (a) They insist that the contract, if valid when made, expired with the close of the guardianship of Margaret Harper; and that she revoked it after attaining her majority. If she had the right of election at the end of her guardianship, she exercised that right by affirming the contract in her deed to A. B. Hardin, dated 9–29–1846, referred to and quoted from in the foregoing statement taken from appellees' brief. True, that deed was void as a conveyance of an interest in land because of Margaret's defective acknowledgment, as well as for other reasons, but notwithstanding that defect, it constituted an election by her to abide by the contract made for her by her guardian. Since the contract, when originally made, was valid and upon a good consideration, no new consideration was required, moving from A. B. Hardin to Margaret to constitute a valid election by her. If she had the right of election—which we do not think she had under the facts of this case—all the law required was for her to exercise that right in a legal manner. Her deed to Hardin contained all the elements of a valid election.

■ (b) Appellants further insist that Margaret revoked and rescinded the A. B. Hardin contract by her deed to W. C. Abbott, dated the 23d of November, 1855. Of course, if her deed to Hardin in 1846 was a ratification of the contract, then she had no right of rescission. The Abbott deed was a quitclaim deed, and he took his title subject to Hardin's rights and those holding under him. Dodge v. Litter, 73 Tex. 319, 11 S.W. 331.

■ (c) After Magruder's abortive effort to survey the land in Liberty County, Margaret, in some way not explained by the record, secured possession of the certificate and located one labor of land in Tyler County, which she appropriated to herself without recognizing Hardin's claim. She then had her agent Green and later her agent Isbell attempt to locate the certificate in McLennan County, but these attempted locations were not recognized by the Land Office. Appellants insist that these acts by Margaret constituted a repudiation of the Hardin contract, as a matter of law, or at least they were evidentiary on that issue.

These facts and circumstances did not constitute a repudiation, as a matter of law, even if Margaret had the right of repudiation, but, at most, were only evidentiary on that issue. The weight of these facts and circumstances as evidence on the issue of repudiation was destroyed by Margaret's subsequent deed to Hardin recognizing his claim as now asserted by appellees.

(d) Against appellants' contentions, it is our conclusion that W. C. Abbott took and held his title in recognition of the title of A. B. Hardin. On this proposition the undisputed facts are that he held under a quitclaim deed; after taking the deed from Margaret, Abbott did not locate the certificate, but with knowledge of Hardin's claim permitted him to locate it and then asserted his claim to the land appropriated by Hardin under the certificate. If Abbott knew of Hardin's claim—and under the law he was visited with that knowledge—he could not claim the benefits of Hardin's location and then repudiate Hardin's interest in the land. Reed's Adm'r v. West, 47 Tex. 240; Doss v. Slaughter, 53 Tex. 235; Bell v. Warren, 39 Tex. 106. In this connection we say there is not a circumstance in the record raising the issue that Abbott ever attempted to repudiate Hardin's claim in the Harper League. Abbott and Harper lived together in the town of Liberty from the date of Abbott's deed to his death in 1863; Abbott was a distinguished lawyer and Hardin was a distinguished citizen of Texas, a signer of the Declaration of Independence.

The Hardin contract of location is almost one hundred years old. It has been ninety years since Margaret, the sole heir of Clayton Harper, executed her deed to A. B. Hardin recognizing and ratifying his contract to locate her certificate, and eighty years since Abbott acquired his title, and since A. B. Hardin located the certificate upon the land in controversy. The deed records of Liberty County were burned in 1874. In the very nature of the case, there could be no living witness to these ancient transactions. The title of A. B. Hardin and those holding under him was never questioned until appellants filed their original petition in this cause on the 17th of October, 1934. On this record every presumption not rebutted by the facts and circumstances in evidence should be indulged in support of the Hardin title. It is our conclusion that the evidence, as a matter of law, vested the title to the Har-

732

per league; one-half in W. C. Abbott and one-half in A. B. Hardin.

We overrule appellees' contention that they had title to the south one-half of the league under the statute of limitation of ten years (Vernon's Ann.Civ.St. art. 5523-a). Appellees claimed under the possession of one Wells and one Gilchrist who, as they insist, were joint tenants with them in the ownership of the south one-half of the league. Wells and Gilchrist entered upon the land, each claiming under deeds to an undivided interest in the south one-half of the league, and each appropriated to himself, by actual survey on the ground, the number of acres equal to his undivided interest. Each went into possession of his separate claim, cultivating, using, and enjoying it, and on the trial appellants conceded limitation title under these claims. On the undisputed facts Wells and Gilchrist limited their claim to the land appropriated by them; their claim did not extend beyond their boundaries, and as there was no claim beyond their boundaries their possession, occupancy and use of the two specific tracts of land did not inure to the benefit of appellees' title. Read v. Allen, 63 Tex. 154.

With the silent acquiescence of those holding under A. B. Hardin, the heirs of W. C. Abbott appropriated to their exclusive use, and sold as the sole owners, the north half of the league. The facts showing the appropriation and sale are summarized above in the statement taken from appellees' brief. These acts by the Abbott heirs constituted an equitable partition, vesting in them title to the north half of the league, and vesting in those holding under A. B. Hardin title to the south half. Berryman v. Biddle, 48 Tex.Civ.App. 624, 107 S.W. 922; Berryman v. McDonald, 49 Tex.Civ.App. 81, 107 S.W. 944; Jennings v. Borton, 44 Tex.Civ.App. 280, 98 S.W. 445 (writ refused); Harrison Oil Co. v. Sherman (Tex.Civ.App.) 66 S. W.(2d) 701.

It follows that the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.

On Rehearing.

On request of appellants, we make the following additional fact conclusions:

First. "It is found that A. B. Hardin rendered land in the Clayton Harper grant from 1850 until 1859, at which time he ceased to render the same and made no further rendition until the death of W. C. Abbott in 1863, or thereafter, until his own death in 1871."

Second. "On March 30, 1882, R. Abbott, the son of W. C. Abbott, delivered to Judge Hugh Jackson certain papers belonging to his father, and among said papers was a deed from J. W. Hall and wife to W. C. Abbott and another deed from A. B. Hardin to W. C. Abbott."

Third. "After ceasing to render the land in 1859, there is no evidence in the record that A. B. Hardin ever asserted any act of ownership over the land in controversy from 1859 until his death in 1871."

Of this third finding we say it must be construed in connection with and as in no way limiting the findings in the original opinion, with the further statement that there is no circumstance in the record negativing a claim by Hardin to the land.

Fourth. "That Reginald Abbott, who inherited the rights of W. C. Abbott, was born by 1857, and was six or seven years old at the time of his father's death, at which time he was in Tennessee, with his grandparents, where he continued to live until about the year 1907, and there is no evidence that he knew of any assertions of ownership against the property by the heirs of A. B. Hardin."

Fifth. Appellants request the following conclusion: "That the first location on the land in controversy having any effect in law was in 1856, and that prior to that time it was not shown that A. B. Hardin did anything by virtue of any contract with the probate court other than to deposit $40.30 in Harris County in 1842, or four years after the Magruder Survey was made."

This finding is granted in the following respects: "The first location of the land in controversy having any effect in law was in 1856." As we understand the record, prior to 1856, as shown by the statement in the original opinion, A. B. Hardin made an unsuccessful effort to locate the certificate in controversy upon the league of land now in controversy.

Appellants also ask that we consider their proposition against the admissibility of the deed from Mr. and Mrs. Magruder to A. B. Hardin, referred to and discussed in the original opinion. In the original opinion we held that this deed was void as a conveyance of title, but it is our conclusion that it was admissible on the

issue that Mrs. Magruder recognized and ratified the contract made for her by her guardian with A. B. Hardin, and on the terms and conditions of that contract. Attacking that deed, we quote, as follows from appellants' motion for rehearing:

"This Honorable Court, by its opinion, admits that the purported deed of 1846 was void, and yet it takes the land away from the plaintiffs upon the force of this void instrument on the theory that it constitutes an admission of Mrs. Magruder, and upon such admission it is given all the force it could possibly have had as a valid deed."

"Your Honors hold this purported instrument not to have been properly acknowledged, but you do not hold it null and void in accordance with the decisions above cited, but hold that by such instrument this woman lost her rights in the land. In other words, you hold it did not comply with the statute but, notwithstanding this, you make her do by indirection what the law said she could not do directly, that is to so pass her title by such an instrument. She had nothing to ratify. She never had made a contract having any reference to this land or this certificate."

Appellants have misconstrued our opinion. We did not give this deed any effect as a conveyance of title to land—in that office the deed was absolutely void. But, as stated above, we held it was admissible on the issue of the execution of the A. B. Hardin contract and of Mrs. Magruder's subsequent ratification and recognition of that contract. Again, appellants say in their motion for rehearing: "We submit that to hold that this title was divested by ratification or estoppel, is not supported by this record." By this proposition appellants have not correctly construed our opinion. We did not hold that appellants lost their title by "ratification or estoppel." Ratification or estoppel were not involved in the issues relating to the title to the land, except in so far as the title grew out of the A. B. Hardin contract. Appellants did not lose their title by virtue of the conveyance from Mr. and Mrs. Magruder to A. B. Hardin, for neither they nor those under whom they hold ever had any title to the land in controversy because the title to this land passed to A. B. Hardin by virtue of the contract of location made by him with the guardian of the minor.

Again, appellants say in their motion for rehearing: "In this case this Honorable Court has held that A. B. Hardin could exercise powers under a guardianship which had terminated 15 years before, which holding is unsupported by any decision, and is directly contrary to the decisions above cited." Our original opinion is not subject to this construction. We held that A. B. Hardin had a valid contract with the guardian of the minor and that under this contract he acquired a vested interest and that, operating under this contract, the land in controversy was located and by virtue of this contract he acquired a one-half interest in the land.

We have given most careful consideration to appellants' able argument on rehearing, but believing that our original opinion correctly disposed of all issues, the motion for rehearing is in all things overruled.